EMMA INGRAM and ELLA INGRAM, (by their next friend,) plaintiffs in error, vs. WILLIAM FRALEY, executor, &c., defendant in error.

" I, LaFayette Ingram, make the following disposition of my property: Owing to the peculiar condition of my property, and being desirous of keeping my negroes together as long as it can be done, and having the utmost confidence in my long tried friend, William Fraley, that he will entirely carry out my wishes and desires, as they may be expressed by me, either verbally or in writing; and well knowing that my said friend will, by this will, be able much more effectually to dispose of my estate, as I wish it done, than I could at this time do myself, and with much less trouble to himself, I hereby give to the said Fraley my entire estate, real and personal, notes and other debts due me, money and property of every kind.

" I nominate, constitute and appoint my friend William Fraley, executor of this my will, hereby revoking any and all former wills by me made, and declare this to be my only last will and testament."

*Held,* That the words accompanying the bequest in this will, created a trust, and would, had the trust been sufficiently declared, excluded all discretion in the legatee; but the testator having failed to declare the trust, the legatee did not take the estate beneficially, but held the same as trustee for the next of kin of the deceased.

In Equity, in Hancock Superior Court.    Tried before Judge THOMAS, at October Term, 1859.

This was a bill filed by Emma Ingram and Ella Ingram, by their next friend, against William Fraley, for a discovery and account of the estate of LaFayette Ingram, deceased, and that defendant be decreed to pay over to complainants their distributive share thereof, as heirs at law of decedent, they being the children of a deceased brother.

Defendant resisted this demand on the ground that La-Fayette Ingram departed this life, leaving in full force his last will and testament, whereby he devised and bequeathed his entire estate to defendant, and that complainants had no right, title or interest in or to the same, or any part thereof.

The following is a copy of the will of LaFayette Ingram, deceased, under and by virtue of which defendant claimed the estate aforesaid, to-wit:

" STATE OF GEORGIA, HANCOCK COUNTY.

I, LaFayette Ingram, of the State and county aforesaid, being at this time sick, but of sound and disposing mind and memory, do make the following disposition of my property: Owing to the peculiar condition of my property, and being desirous of keeping my negroes together, as long as it can be done; and having the utmost confidence in the integrity of my long tried friend, William Fraley, of said county, and that he will entirely carry out my wishes and desires, as they may be expressed to him by me, either verbally or in writing; and knowing that my said friend will, by this will, be able much more effectually to dispose of my estate, as I wish it done, than I could at this time do myself, and with much less trouble to himself, I hereby give to the said Fraley my entire estate, real and personal, notes and other debts due me, money and property of every kind.

I nominate, constitute and appoint my friend William Fraley, executor of this my said will, hereby revoking any and all former wills by me made, and declaring this to be my only true last will and testament. ·

I have hereto subscribed my name and affixed my seal, this 10th day of July, 1856.

(Signed) LAFAYETTE INGRAM. [L. S.]

Signed, sealed and declared by the testator to be his last will and testament, who, in his presence, and in the presence of each other, have hereto subscribed our names as witnesses. The words " than I could at this time do myself," interlined before signing by the testator or witnesses.

E. W. ALFRIEND,

R. GOODLOE HARPER,

ELIZABETH HARPER."

Complainants' counsel opened their case by reading the bill and answer.

Defendant's counsel submitted the following statement of facts agreed upon by counsel on both sides, viz:

That testator and William Fraley were brothers-in-law—the latter having married testator's sister in the year 1828. Upon the death of testator's father, testator and defendant, about the year 1832, purchased jointly the plantation of their deceased ancestor, and placed their negroes on it; they have subsequently bought jointly small adjacent pieces of land; they have farmed together from the year 1832 to the time of Ingram's death; they purchased jointly, in the mean time, a family of negroes placed on the farm; their negroes have intermarried, and become mixed in families for more than one generation. Testator was a bachelor; lived on the farm; encouraged this intermarriage, and treated all the negroes with like humanity and attention. William Fraley lived in the village of Sparta, and furnished some things that had to be bought off of the farm; sold most of the cotton crops, and managed chiefly the outside business; Ingram sold such things as grain, &c., sold and delivered at the plantation. Testator and defendant had their joint transactions, including a purchase of lands in Alabama, amounting to several thousands of dollars. Among the negroes on the plantation, were a family of mulattoes, to which testator, for reasons not necessary to be repeated, had a strong affection; the closest intimacy and fullest confidence existed between testator and defendant; Fraley's wife died before testator.

Defendant then introduced the following evidence:

*Ingram Bass* sworn, testified: That he lived with testator, working on the farm, in 1832 and 1833, and from 1835 to 1839 lived in a quarter of a mile of him; during that time knew of no settlement between Fraley and Ingram; was intimate with Ingram; he talked freely with witness as with any one; heard of no settlement between Ingram and Fraley.

*Henry T. Fraley* testified; That he lived with his uncle, the testator; went there to live in 1846 or 1847, after witness quit school; prior to that time spent his vacations with him; lived in the house with him three or four years after 1846; knows of no settlement between my uncle and my father, the

defendant; my uncle told me frequently that there never was any settlement; told me as a reason that there never was any settlement, that he never intended to divide his property, or separate his negroes; he intended to leave it to his sister's children; had no sister but my mother; heard him say the night before he made his will, that he did not want his property to go to Alabama; that he was willing to die but if he was to die that night, part of his property would go there.

*Cross-examined.*—Witness told him he might make his will any time he wanted; he said he did not want it to go to Alabama; he was very ill; he died about two days after the will was made; after he made his will he had no conversation with me about his property; when witness left him, he was talking with witness's father; it may have been twelve months before his death that he said he intended to give his property to his sister's children; not able to fix the time.

*LaFayette Fraley* testified: That the morning testator made his will, and after it was made, the others went out of the room; he asked witness to hand him a gourd of water; he said he did not want his property to go to Alabama.

All that portion of the foregoing testimony, relating to the sayings of the testator, were ruled out and excluded by the presiding Judge, from the consideration of the jury.

The Court charged the jury, that the will contained a valid disposition of the estate of LaFayette Ingram, deceased, and vested the same absolutely in William Fraley, the legatee therein named, and that complainants were not entitled to recover. To which charge complainants excepted.

The jury, under the charge aforesaid, found for the defendant. Whereupon, counsel for complainants tender their bill of exceptions, assigning as error the charge aforesaid.

J. WINGFIELD; ALEX. H. STEPHENS; and ROBT. TOOMBS, for plaintiffs in error.

B. H. HILL; and T. R. R. COBB, *contra.*

Ingram and Ingram vs. Fraley.

*By the Court.*—LUMPKIN J. delivering the opinion.

It will be conceded that the words used in this will, are sufficient to vest the legal title to the property in William Fraley.    And the question is whether, from the whole will, we are bound to infer it was not the intention of the testator to give it to him absolutely, but on the contrary, that a trust was intended.    If so, William Fraley, the legatee, will be excluded from taking any beneficial interest under the will.

I have neither the time nor the inclination to review the library of volumes read on the argument.    The numerous decisions upon this question, have been thoroughly examined by the able and distinguished counsel who have argued the case.    And the conclusion to be drawn from this thorough review is, that so infinitely various are the forms of expression used by testators, that all that remains for the Courts to do, is to determine, upon the terms employed in each particular case, whether an absolute gift was intended, or was the legal title placed in the hands of the legatee, to enable him to carry out some fiduciary appointment respecting the property ?

Where the testator declares expressly that he gives the property *upon trust,* and yet declares no trust, it is admitted there is no doubt or difficulty.    It has long been established that, in such a case, the next of kin will take.    And yet it must be conceded, that a fiduciary intent may be equally indicated by other expressions.    And can it, we ask emphatically, make any difference when equivalent words are used ? No particular words, we know, are necessary to create a trust. This is one of the elementary rules, under the head of Trusts. The books make no such distinction.    It would be too unreasonable ever to find favor or foothold in the Courts.

If *Briggs against Penny (8 Engl. L. & E. R. 231)* be law, it settles this case conclusively for the plaintiffs in error· This is not disputed.    There, the testatrix, Frances Harley, after giving to the legatee, Sarah Penny, certain pecuniary

legacies, and making other bequests, gave all the rest, residue and remainder of her personal estate to Sarah Penny, her executors, administrators, and assigns, "well knowing that she would make a good use and dispose of it in a manner in accordance with her views and wishes." She nominated Sarah Penny her sole executrix, and declared, "that alone to be her last will and testament." The testatrix never formally declared her "views and wishes." Various papers were found in her handwriting, expressive of her "views and wishes;" and containing directions for Miss Penny, with regard to her property. But those papers were some of them void under the Mortmain Act, and none of them were admitted to probate.

It was held by the Vice-Chancellor, upon the construction of this will, that Miss Penny did not take the residue beneficially, but that it was a resulting trust in favor of the next of kin. And this decree was affirmed by the Chancellor, upon the appeal. It needs only to read the two wills to see how much stronger the case under consideration is than this.

But it is insisted that this case is contrary both to principle and precedent; and therefore, is not law. The learned and eminent counself have failed, we think, in making good this assumption. It is in conflict with neither, but in accordance with both, when properly understood and applied. *Morice vs. the Bishop of Durham (10 Ves. Ch. Rep. 522,)* is admitted on all sides to lay down the true doctrine upon this subject. Let us test then this case by that.

Lord Eldon there distinctly held, that "if the testator meant to create a trust, and not to make an absolute gift, but the trust is ineffectually created—is *not expressed at all*—or fails, the next of kin take." And " on the other hand, if the party is to take himself, it must be upon this ground, *according to the authorities*, that the testator did not intend to create a trust, but intended a gift to that person for his own use and benefit." To this sound and sensible rule the Court ad-

hered in *Briggs and Penny*, and by it we will abide in the case before us.

It is true that Lord Eldon did say that " it might perhaps *originally* have been as weil to have held, that if the testator did not declare any. trust, the person to whom the property was given should take it." Thus yielding implicitly, that the law was otherwise. And this great Judge will find few, we apprehend, to concur with him in the opinion, that where property is placed in the hands of another, for a particular purpose or person, that if the desire and design of the testator fails of accomplishment, for any cause, that the mere naked trustee or depository should, therefore, take and hold it for his own use and benefit, to the exclusion of the next of kin. Such a proposition is abhorrent to every one's sense of justice.

Where the language of the will is vague and indefinite as to the objects of the trust, this fact is legitimately used as an argument, to show, that no trust was intended to be created. This is relied on in *Morice vs. The Bishop of Durham.* And not denied in *Briggs vs. Penny.* But if the words in the latter, " well knowing that she will make a good use and dispose of it in a manner in accordance with my views and wishes," were deemed sufficient to impose a trust in *Briggs vs. Penny*, a *multo fortiori* do the terms of Mr. Ingram's will necessarily import a trust.

" Having the utmost confidence in my long tried friend William Fraley, and that he will entirely carry out my wishes and desires, as they may be expressed to him, verbally or in writing, and knowing that my said friend will by this will be enabled, much more effectually to dispose of *my estate* as *I* wish it done than I could at this time do myself, and with much less trouble to himself, I hereby give," &c.

Can any one read or hear read this will, and contend, that it was the intention of the testator, to give his property to the legatee absolutely and for his own use and benefit. To arrive at such a conclusion, it must be by some arbitrary and

technical rule of construction not patent to the common understanding. We know of none such; nor do the adjudications furnish any.

This whole will is embraced in a single sentence. And it has been urged with much plausibility, and even force, that the recitation in the preface is nothing more than the reasons assigned by the testator, for making the bequest which follows. However specious this reasoning, we are not satisfied of its soundness. Either the testator had previously made known to Mr. Fraley his " wishes and desires," as to the disposition he intended him to make of his property, or he designed to do so, " verbally or in writing." Otherwise he could not say that he had entire confidence in his integrity, that he would carry them out fully. And what possible difference can there be between such a case, and that of a testator who gives all his estate to one *upon trust*, but never declares the trust? None that we can see.

And suppose the objects of the trust in this case were certain, and the plan of disposition also, would any Court hold, that the words of this will were not imperative, and *its* execution could not be enforced? Surely not. Chancery would decree, it has done often, upon words much less mandatory, that there was no discretion left to the legatee, but an obligation imposed upon his conscience by the will, not inclining him merely, but compelling him to execute the testator's purpose. Such, at any rate, is our interpretation of the will.

It has been ingeniously suggested that while the terms of this will might be sufficient to create a trust in an English will, still that consequence would not necessarily *follow* here. That there, the wish or desire of the testator was naturally supposed to be founded on and growing out of his affection for the object of his bounty, his legatee. He gave his land or his stock or his money, to his relative, his friend, or to charity; not for the love or regard he had for the thing given, but for the person to whom *given*; or the purpose for which he gave. But that this is not necessarily so in Geor-

Ingram and Ingram vs. Fraley.

gia.   That it is not an uncommon thing for our people to cherish a strong affection for their negroes.   Fidelity, association, mutual struggles and benefits, and many other causes, often produce warm attachments between master and slave, which must enter into the solicitude of the owner in determining and directing how his property shall be disposed of after his death.   True, our laws prohibit manumission; but they do not forbid the master to permit his slave to select his future owner, and to express the desire, that husband and wife, parent and child, friends and relations, shall not be separated, but kept together as long as it can be done.

Grant all this.   Counsel seem to have overlooked the fact, that a trust may have been contemplated for the benefit of the slaves themselves; and prompted by the very causes which he suggests.   Nothing is more common in the slave States.   Still if the testator failed to declare it, are not the next of kin equally entitled?   We do not see, that this supposition helps the construction contended for, in behalf of the defendants in error.

And then, if we look to surrounding circumstances, as disclosed by the outside evidence, the case is plain.   The parol proof was offered by Wm. Fraley, and rejected by the Court. That decision is excepted to; but the opposite counsel agree that it shall be considered by this Court without objection, and what does it establish?   That the testator uniformly declared, that none of his *slaves*, should go to Alabama, or to the Ingrams, if you please, his brother's children, but that he intended to give them to his sister's children, the young Fraleys, *but not to their father, the legatee.*

I would remark in passing, that had he declared expressly, that the complainants in the bill, his heirs at law, should never inherit *any* portion of his estate, still they would take, unless it had been disposed of otherwise.   (*Wright vs. Hicks,* 12 *Ga. Rep.* 155.)   And we submit in all candor, if owing to the peculiar situation of the testator's property, and the par-

amount wish and desire of his heart was, to keep his negroes together as long as possible, is it not much more probable, that he would have directed this to be done, until the youngest child of William Fraley became of age, and then to be divided between the offspring of his sister,.than to have given them to their father unconditionally, who was an aged man; and at whose death, to say nothing of other contingencies, they would have been subject to a subdivision amongst his family?

And yet if this was the purpose in the mind of the testator, and he failed to declare it, the complainants would come in for the two-sixths of their uncle's estate, which they are seeking to recover; the four Fraley children taking the other four-sixths.

Wishing to meet this case in the strongest light in which it has been presented to sustain the judgment, we have foreborne to intimate several testamentary schemes which might have been in the testator's mind, in the disposition of his estate. To say nothing of any emancipation project, what is there effectually to combat the idea, that he intended his slaves for his sister's children, and to make up the portion of his nieces, out of his lands, notes and other effects?

But being convinced from the face of the will, that some trust was intended, without pretending to know or even to guess what that trust was, no more than we could have done, had the testator simply declared that he gave his property to William Fraley, *upon trust*, and there stopped; we are clear that the legatee takes nothing beneficially under the will of LaFayette Ingram, and that the estate is subject to distribution between the next of kin of the deceased.

Judgment reversed.

Judge STEPHENS having been of counsel in this case, prior to his promotion to the bench, did not preside.